UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

David W. Thayer,

           Plaintiff,

v.                                            Case No.  22-3086-DDC

Laura Howard, *et al.*,

           Defendant(s).

**PRETRIAL ORDER**

On August 16, 2023, U.S. Magistrate Judge Kenneth G. Gale conducted a pretrial conference in this case by phone.  Plaintiff David W. Thayer appeared *pro se*.  Defendants Laura Howard, Lesia Dipman, Jeff Brown, Haleigh Bennett, and Linda Kidd ("Defendants"), appeared through counsel Matthew L. Shoger.

This pretrial order supersedes all pleadings and controls the subsequent course of this case.  It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

1. **PRELIMINARY MATTERS.**

   a. **Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is claimed by Plaintiff, citing the laws in the "Governing Law" section below, and is disputed by Defendants due to Eleventh Amendment immunity, lack of standing, and mootness.

   b. **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

   c. **Venue.**  Venue in this court is not disputed.

    **d.**    **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law:

- **i.** 42 U.S.C. § 1983
- **ii.** U.S. Constitution
   - **A.** First Amendment
   - **B.** Fourteenth Amendment
- **iii.** Kansas Bill of Rights Section 10
- **iv.** Religious Land Use and Institutionalized Persons Act (RLUIPA) (42 U.S.C. § 2000cc *et seq.*)
   - **A.** (The Court dismissed any RLUIPA claims against Defendants in their individual capacities on August 22, 2022 (Doc. 11).)
- **v.** Kansas Sexually Violent Predator Act (KSVPA) (K.S.A. 59-29a01 *et seq.*)

**2.**    **STIPULATIONS.**

    **a.**    The following facts are stipulated:

- **i.** Laura Howard is the Secretary of the Kansas Department for Aging and Disability Services (KDADS).
- **ii.** Lesia Dipman is the Superintendent of Larned State Hospital (LSH) where Plaintiff resides and is involuntarily committed for control, care and treatment.
- **iii.** Jeff Brown is the Chaplain for LSH and his duties include facilitating Thayer's religious rights.
- **iv.** Haleigh Bennett was the Program Manager for the Sexual Predator Treatment Program (SPTP) until February 2022, whose duties included managing the day-to-day operations of the SPTP.
- **v.** Linda Kidd is the SPTP Program Leader.

      **vi.**    A posted "memo" of March 2020 addressed suspension of all religious callout activities, including religious group meals. Multiple memos were posted after March 2020 that eased and tightened these restrictions.

      **vii.**    Three Native American religious "callouts" are recognized at the SPTP and that Thayer is part of the independent Native American callout.

      **viii.**    "Liquid smudge" was and is allowed.

      **ix.**    SPTP residents are permitted to buy and use personal prayer pipes.

      **x.**    All religious callouts were suspended following a resident's escape, which occurred in late June of 2021.

      **xi.**    Religious callouts were occasionally cancelled or restricted after June 2021.

      **xii.**    All religious callouts were suspended the weekend of July 3-4, 2021.

      **xiii.**    Religious "callouts" were limited to 30 minutes a week in late 2021.

      **xiv.**    In October 2022, all religious ceremonies were limited to meeting for one hour per week (including ceremonies for the Native American religious), and group ceremonies for such things as "passings" and holidays were not permitted.

      **xv.**    The sweat lodge ceremony started to not be permitted in March of 2020.

    **b.**    The parties have not stipulated to the admissibility of any exhibits for purposes of summary judgment or trial.

**3.**    **FACTUAL CONTENTIONS.**

    **a.**    **Plaintiff's Factual Contentions.**

      **i.**    Plaintiff is an adherent to a Native American faith system.

      **ii.**    The following Native American religious activities have been restricted at times by Defendants for Plaintiff and at least some of these activities continue to be restricted: smudging, sweat lodge ceremonies, communal meals, pipe and drum ceremonies, and healing and passing ceremonies.

    **b.**    **Defendants' Factual Contentions.**

      **i.**    Defendant Secretary Howard joined KDADS in January 14, 2019.

3

 **ii.** Defendant Superintendent Dipman has been superintendent of LSH since May 2019. Before then she was the acting superintendent from February 2019 to May 2019.

 **iii.** Defendant Chaplain Brown has been the chaplain at LSH since about 2014.

 **iv.** Defendant Bennett is currently the chief operations officer for LSH. She assumed this position in August 2022. Before then she served as the interim administrative program director for SPTP at LSH from February 2022 to August 2022 and the SPTP program manager at LSH between December 2016 to February 2022.

 **v.** Defendant Kidd has been the program leader for SPTP at LSH since about 2015.

 **vi.** Plaintiff remains committed pursuant to the Kansas Sexually Violent Predator Act ("KSVPA"), K.S.A. 59-29a01 *et seq.*, as amended, and in the Sexual Predator Treatment Program ("SPTP") at Larned State Hospital ("LSH") in Pawnee County, Kansas, in the custody of the Secretary.

 **vii.** KDADS has supervisory authority over LSH, a psychiatric facility. One of the programs located on the LSH campus is SPTP. SPTP provides treatment for convicted sex offenders who have completed their prison sentences but have been determined by the courts to be violent sexual offenders in need of involuntary inpatient treatment.

 **viii.** SPTP has been given two primary missions. First, SPTP provides for the public safety to prevent further victimization of others by sexual offenders assigned to the program. This requires adequate security and the ability to establish a safe environment for staff and residents within the boundaries of the parts of the LSH campus dedicated to SPTP. The second mission of SPTP is to provide treatment to those residents willing to engage in the work of personal change. The ultimate aim of this treatment is to reduce the individual's risk for re-offense to a level, which would allow the return of the individual to society as a contributing, productive citizen.

 **ix.** The inpatient SPTP housing is in the Dillon Building, Isaac Ray Building, and Jung Building. At all relevant times, Plaintiff has been a resident in the inpatient housing in Dillon at LSH. Dillon is a secure facility in the sense that it is much like a jail or prison. Entry to and exit from the buildings are by security-monitored, locked entrances. Its grounds are surrounded by fencing and wire. The fencing is separated from surrounding structures and woodlands to prevent unobserved access.

 **x.** Areas in and around Dillon have been dedicated for residents to engage in the religious exercise of their choice. For adherents to faiths that conduct ceremonies and services outdoors, a fenced and secure area is provided at the Northwest corner of Dillon's grounds. The area has been parceled to provide separate plots for worship/ceremonies by adherents of the faith systems of

|      | |
|------|---|
|      | Native Americans identified as Gray Wolf, Red Wolf and Independent. Then there are also separate plots within the area for adherents to other faith systems. |
| xi.  | On or about March 12, 2020, LSH activated an "Pandemic Preparedness Plan" to address how to best avoid and manage COVID-19 transmission and infection at LSH. The plan has been updated and modified overtime. Among many other items, the plan lists and listed restrictions on group activities of LSH visitors, staff, patients and SVP residents. The restrictions were and are religion neutral, both as to religion generally and as to any particular religion. The scope of the restrictions has varied depending upon active COVID-19 cases in Pawnee County and surrounding counties, active COVID-19 cases in LSH staff or patient/resident. LSH has moved in and out of different phases. However, resident have always been permitted to conduct individual religious services regardless of the phase. |
| xii. | Overtime COVID-19 restrictions were loosened or retightened to respond to infection levels at LSH or within Pawnee County. |
| xiii.| In designing the scope and application of restrictions and measures because of COVID-19, LSH/SPTP had to account for the fact that (1) patients and residents, along with LSH staff, are necessarily confined to relatively small areas within LSH's buildings and (2) many of LSH's patients and most of the SPTP residents have a higher risk of serious complications and even death from COVID-19 infection then general populations because of their preexisting health conditions and age. |
| xiv. | Religious adherents and, in particular Native American religion adherents, were in no way singled out or treated differently in comparison to other religions or other group activities. |
| xv.  | Defendant Howard has not participated in decisions on COVID-19 restrictions at LSH. |
| xvi. | Native American religious groups are currently permitted to smudge daily, to conduct pipe and drum ceremonies weekly, to conduct sweat lodge ceremonies monthly, and to conduct healing and passing ceremonies. |
| xvii.| Due to a lack of moisture or fire hazard conditions, from time to time, the Board of County Commissioners of Pawnee County imposed a burn ban for the county, which placed restrictions on outdoor burning. LSH previously interpreted the burn bans to prohibit outdoor non-liquid smudging and smoking. |
| xviii.| LSH's adherence to the burn bans was more than just recognition of the county-imposed rule. Larned only has volunteer firefighters, and while LSH has its own fire engine on the hospital's site, there was a period of time when the fire truck was out-of-service. Moreover, in March 2022, a large wildfire broke out in the Larned area that threatened LSH's property. In summary, the adherence to the |

|       |       |
|-------|-------|
|       | burn ban was a reasonable precaution imposed on everyone at LSH for the safety of its patients, SPTP residents and staff, and to protect the LSH facilities. |
| xix.  | However, with an interpretation of the county ban from Pawnee County officials and the completed repair of LSH's fire engine, outdoor non-liquid smudging and pipe ceremonies have been permitted even during a burn ban since September 11, 2022, so long as there is a bucket of sand and water at each smudge location and the area's garden hose is hooked-up and attended by a staff member. |
| xx.   | In March of 2020, two sweat lodges had been erected in the area described in ¶ vii, *supra*, which were dedicated for the separate use by adherents of the faith systems of Native Americans identified as Grey Wolf and Red Wolf. There has never been a sweat lodge for the Independents, which is a small group of residents that split off from the Grey Wolf group. |
| xxi.  | Sometime in 2020, the sweat lodges at Dillon deteriorated from exposure to the elements to so they had to be removed. In 2023, the willow materials necessary for any reconstruction was not available for harvest until late spring. In 2023, sweat lodges were constructed. |
| xxii. | Sweat lodge ceremonies are currently permitted once a month. |
| xxiii.| Residents currently eat their meals in their rooms. Residents' meals are prepared at the LSH kitchen and served in pre-packaged portions. Before LSH's COVID-19 protocol was in place, residents housed at Dillon generally ate their meals its cafeteria under staff supervision. However, meals have not been served to residents at the cafeteria since March of 2020 because the cafeteria room is not large enough to accommodate social distancing mandated under even the least restrictive phase of the Pandemic Preparedness Plan and the required masking is not possible while eating. |
| xxiv. | Additionally, since March 2020, residents have not been allowed to have outdoor group meals/feasts. Generally, the group meals are not permitted because the operative phase of the LSH's COVID protocol prohibits group gatherings or, under the applicable phase requirement, the available space outdoors for the meal was not sufficient to accommodate the required social distancing and masking. |
| xxv.  | LSH medical professional staff have concluded that meals or feasts that are served "family-style," instead of by separately packaged portions, cannot be allowed because of the unacceptable risk, in the jail/prison like setting, of the transmission of diseases and infections. Furthermore, LSH and residents are not equipped to properly prepare some of the traditional foods (deer, elk, buffalo, pemmican and perhaps even fry bread, in the "traditional" manner), so that the food is safe for consumption. There are also unacceptable security and safety problems from allowing residents to prepare the meals (*e.g.*, access to fire and |

        potentially dangerous tools). Finally, LSH/SPTP does not have the food budget to pay the additional cost for traditional meals, and cannot preferentially subsidize the exercise of religion by paying more for Native American religious meals/feasts than it already pays for residents' usual daily meals. Thus, LSH/SPTP currently anticipates that religious meals and feasts may be observed in the future when COVID-19 protocols permit. But LSH/SPTP is considering and likely to adopt a policy that the meals must be in separately packaged portions, properly prepared, and the additional cost of the meals/feasts must be borne by resident(s) or outside donor(s), with SPTP's contribution limited to what it does not pay to offer some usual daily meals on the day of the religious meal/feast.

    **xxvi.**    Nevertheless, there has not been a time where SVP residents could not eat religious meals in their room, by themselves, so long as the resident timely requested the special food, paid any expense beyond the normal cost of the meal that LSH would otherwise provide, and the food preparation met basic hygienic and health requirements.

    **xxvii.**    Low staffing levels, scheduling limitations (including the high priority owed by SPTP to time spent on therapy and treatment of residents), inclement weather, security emergencies, quarantines, and high risks of COVID-19 outbreaks have justified cancelling or restricting religious callouts from time to time since March 2020.

**4.    LEGAL CLAIMS AND DEFENSES.**

    **a.    Plaintiff's Claims.**

Plaintiff asserts that he is entitled to recover upon the following theories: (Second Amended Complaint, Doc. 19 at 12-13.)

    **i.**    "the defendants actions do in fact violate petitioner's religious freedom and rights guaranteed to him by the United States Constitution and the Kansas Bill of Rights Section 10, mandated right to practice petitioners freedom to worship and pray and that his peers are affected as well and are asking these honorable courts to hold the defendants responsible for their action's as acting under the color of State Law, a showing of prejudicial indifference concerning the right to practice in and worship of prayer. The Statutory right of petitioner and his peer's rights pursuant to K.S.A. 59-29a22(b)(8) and the 1st and 14th Amendment of the United State Constitution. The rights to worship and pray and under the 14th Amendment The right to Due Process when a conflict has risen."

    **ii.**    "Such actions may be acceptable in prison and a penal setting, but these act if the indifference to these rights are not and cannot be found to be

7

                    acceptable in a civil commitment setting for which the Petitioner and his Peer's that are civilly confined see (Hendricks, Crane, and Bell v. wolfish)"

        iii.    "the defendants have far too long continued to violate all parties, protected right to the freedom of practice our religion and to worship and prayer"

    b.    **Defendants' Defenses.**

Defendant asserts the following defenses:

        i.    Eleventh Amendment immunity

        ii.    Lack of standing

        iii.    Mootness

        iv.    Qualified immunity

        v.    Failure to state a claim

        vi.    Lack of personal participation

        vii.    Lack of a factual basis for some claims and requested remedies

        viii.    No substantial burden to religious exercise

        ix.    Any substantial burden on sincerely held religious beliefs is justified by compelling government interests

        x.    No discriminatory purpose

        xi.    No conscious or intentional interference with free exercise of religion

        xii.    Any substantial burden on sincerely held religious beliefs is reasonably related to legitimate government interests, and is not an exaggerated response to such objectives

        xiii.    The court should decline to exercise supplemental jurisdiction over the state law claim

        xiv.    No private cause of action under K.S.A. 59-29a22

        xv.    No claims for damages under K.S.A. 59-29a22

      **xvi.**    Governmental immunity under the Kansas Tort Claims Act with regard to state law claims

      **xvii.**    Failure to exhaust administrative remedies with regard to state law claims

      **xviii.**    K.S.A. 59-29a22 was not violated

**5.    DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Plaintiff requests injunctive relief for eight (8) hours of sweat and double portions of traditional meals. Monetary damages are requested from the Defendants' "representative agency" (so against Defendants in their official capacities) in the amount of $75,000 in punitive damages and $75,000 in compensatory damages.

**6.    AMENDMENTS TO PLEADINGS.**

None.

**7.    DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by **May 31, 2023**. <u>**Discovery is complete**</u>.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.    MOTIONS.**

    **a.    Pending Motions.**

None.

    **b.    Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

    Defendants intend to file a Motion for Summary Judgment.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **September 8, 2023**.  The parties should follow the summary-judgment guidelines on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages.  *See* D. KAN. RULE 7.1(d)(2).  Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline.  *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

c. **Motions Regarding Expert Testimony.**  All motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than **42 days before trial**.

9. **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **June 4, 2024, at 9:00 a.m., in Topeka, Kansas**.  This case will be tried by the court sitting without a jury.  Trial is expected to take approximately 2 days.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

10

10. **ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The status of settlement negotiations is as follows: The parties currently believe the prospects for settlement of this case are poor and they do not believe that further court-ordered ADR would be helpful.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated August 16, 2023, at Wichita, Kansas.

/S/ KENNETH G. GALE
Kenneth G. Gale
U. S. Magistrate Judge