**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **DAVID W. THAYER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case. No. 22-3086-DDC** |
| | ) | |
| **LAURA HOWARD,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT**

Defendants Laura Howard, Lesia Dipman, Jeff Brown, Haleigh Bennett, and Linda Kidd

("Defendants"), submit this memorandum in support of their motion under Fed. R. Civ. P. 56.

Defendants respectfully request that this motion be granted and summary judgment be granted in

their favor. Defendants attach eight new exhibits and state the following in support.

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| A | Declaration of Lesia Dipman |
| B | Declaration of Gabriel Rop |
| C | Declaration of Jeff Brown |
| D | Declaration of Haleigh Bennett |
| E | Declaration of Linda Kidd |
| F | Declaration of Keri Applequist |
| G | Presentation by Deputy Secretary Brunner on "Workforce Issues at Larned State Hospital" to the Kansas Legislature's Special Committee on State Employee and Board Member Compensation on November 29, 2022 |
| H | Defendants' First Set of Interrogatories to Plaintiff |

**NATURE OF THE CASE**

Plaintiff David W. Thayer, civilly committed in the Sexual Predator Treatment Program

at Larned State Hospital, asserts burdens on his exercise of religion under 42 U.S.C. § 1983, the

Religious Land Use and Institutionalized Persons Act ("RLUIPA")[1], and K.S.A. 59-29a22(b). He seeks monetary damages and injunctive relief.

Plaintiff brought this lawsuit on April 28, 2022 (Doc. 1), and filed his Second Amended Complaint ("Complaint") on August 1, 2022 (Doc. 10). On August 22, 2022, the Court dismissed Michael Chubb as a plaintiff, Keri Applequist as a defendant, and any RLUIPA claims against defendants in their individual capacities because RLUIPA does not support individual capacity claims. (Doc. 11.) The Court entered a pretrial order on August 16, 2023. (Doc. 45.)

Each of the remaining Defendants are entitled to summary judgment due to Eleventh Amendment immunity barring monetary relief and claims injunctive relief failing due to lack of a substantial burden and due to compelling government interests. Alternatively, Thayer fails to establish the personal participation of the Defendants, qualified immunity bars any § 1983 individual capacity claims, and Thayer fails to establish the requisite subjective intent for punitive damages. Lastly, the Court should decline to exercise jurisdiction over the state law claims or, alternatively, should dismiss them on the merits.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## NO GENUINE ISSUE EXISTS

1.  Plaintiff David W. Thayer ("Thayer") is "[i]n the custody of the secretary for aging and disability services [*aka* the secretary of the Kansas Department for Aging and Disability Services ("KDADS")] after being found a sexually violent predator pursuant to the Kansas sexually violent predator act…" K.S.A. 59-29a22(a); (Exhibit A at ¶ 13); *see also In re Care and Treatment of Thayer*, 87 P.3d 374 (table opinion), 2004 WL 796770 (Kan. Ct. App. Mar. 26,

---

[1] 42 U.S.C. § 2000cc-1.

2004); *In re Care and Treatment of Thayer*, 396 P.3d 739 (table opinion), 2017 WL 2617152 (Kan. Ct. App. June 16, 2017).

2.   KDADS has supervisory authority over Larned State Hospital ("LSH"), a psychiatric facility, in Pawnee County, Kansas. Exhibit A at ¶¶ 5-7.

3.   One of the programs located on the LSH campus is an inpatient program in the Sexual Predator Treatment Program ("SPTP"). The SPTP provides treatment for convicted sex offenders who have completed their prison sentences but have been determined by the courts to be violent sexual offenders in need of involuntary inpatient treatment. Exhibit B at ¶¶ 3, 6; *see also* Exhibit A at ¶ 9; Exhibit C at ¶ 3; Exhibit D at ¶ 6, 15; Exhibit E at ¶ 3; Exhibit F at ¶ 5.

4.   SPTP houses up to about 275 committed Sexually Violent Predators ("residents" or "SVP residents") at the LSH campus. The program also operates three reintegration facilities, Meyer House (at LSH), MiCO house (at Osawatomie State Hospital) and Maple House (at Parson State Hospital), that provide community-based treatment. Exhibit B at ¶ 7.

5.   SPTP has been given two primary missions. First, SPTP provides for the public safety to prevent further victimization of others by sexual offenders assigned to the program. This requires adequate security and the ability to establish a safe environment for staff and residents within the boundaries of the parts of the LSH campus dedicated to SPTP. The second mission of SPTP is to provide treatment to those residents willing to engage in the work of personal change. The ultimate aim of this treatment is to reduce the individual's risk for re-offense to a level that would allow the return of the individual to society as a contributing, productive citizen. Exhibit B at ¶ 8.

6.   The inpatient SPTP housing is at LSH in the Dillon Building, Isaac Ray Building, and Jung Building. Exhibit B at ¶ 9; *see also* Exhibit D at ¶ 15; Exhibit E at ¶ 35.

7.  At all relevant times (since at least 2019), Thayer has been a resident in the inpatient housing in Dillon at LSH. Exhibit B at ¶ 11.

8.  Dillon is a secure facility with similar security to a jail or prison. Entry to and exit from the buildings are by security-monitored, locked entrances. Its grounds are surrounded by fencing and razor wire. The fencing is separated from surrounding structures and woodlands to prevent unobserved access. Exhibit B at ¶ 10.

9.  An aerial image of the facility can be seen in Exhibit B at 3.

### Religious Call-Outs

10. Religious groups for SPTP residents and their group activities are colloquially referred to as "religious call-outs." Exhibit A at ¶ 14; Exhibit B at ¶¶ 12-13; Exhibit C at ¶¶ 9-10; Exhibit D at ¶¶ 17-18; Exhibit E at ¶¶ 10-11; Exhibit F at ¶¶ 17-18.

11. Different buildings at LSH have their own religious call-outs. Exhibit C at ¶ 6.

12. The religious call-outs at LSH include Asatru, Christians (in a few different groups for different denominations, including Catholic, Protestant, and Jehovah's Witnesses groups), Druids, Jews, Muslims, Native American (in three groups named Red Wolf, Grey Wolf, and Independents), Rastafarians, Satanists, and Wiccans. Exhibit C at ¶ 7.

13. The religious call-outs within SPTP are generally grouped into "nature-based" religious call-outs (including Native American, Asatru, Druid, and Wiccan call-outs) and non-nature-based religious call-outs (including Catholic, Protestant, and Jehovah's Witnesses call-outs). Exhibit B at ¶ 17.

14. David W. Thayer was a member of the Grey Wolf call-out until around April or May 2021, when he became a member of the Independents call-out that split off from Grey Wolf. Exhibit C at ¶ 32; (*see also* Doc. 10 at ¶ 12).

15. Areas in and around the resident buildings have been designated for residents to engage in the religious exercise of their choice. For example, residents in Dillon may conduct religious activities indoors in a "chapel" or other meeting room in Dillon or in a theater on the LSH grounds. Exhibit C at ¶ 11-13; *see also* Exhibit E at ¶ 32.

16. For religious call-outs at Dillon that conduct ceremonies outdoors, often referred to as "nature-based" religious call-outs, a double-fenced and secure area is provided in the northwest portion of Dillon's grounds. The area is referred to as the assembly yard (also known as the religious yard). Alternatively, a more secure location known as a "mod yard" is sometimes used. Exhibit C at ¶¶ 14-17; *see also* Exhibit B at ¶ 18; Exhibit E at ¶¶ 33-36.

17. The assembly yard at Dillon has been parceled to provide separate plots for ceremonies by the Native American call-outs identified as Red Wolf and Grey Wolf. Other nature-based religious call-outs, including Asatru, Druids, and Wiccans, also have designated plots within the area. The Independent call-out split from the Grey Wolf call-out around April or May of 2021 and due to space limitations does not currently have a designated plot but meets in a small area of open land with picnic tables in the southwest part of the assembly yard. Exhibit C at ¶ 18.

18. Images of the Dillon assembly and mod yards can be seen in Exhibit C at 4-15.

### *Current Status of Religious Gatherings*

19. Native American religious groups are currently permitted to smudge daily, to conduct pipe-and-drum ceremonies weekly, to conduct sweat lodge ceremonies monthly, to participate in special meals periodically for holidays, and to conduct healing and passing ceremonies. Exhibit C at ¶ 39.

20. Religious call-outs can meet for one or two hours a week for weekly religious gatherings. Some religious call-outs meet for two hours at once. Native American call-outs use this time for two-hour pipe-and-drum ceremonies. Some religious call-outs meet for two separate one-hour

sessions, such as a one-hour service and a one-hour bible study. Others meet for a single one-hour session. Exhibit C at ¶ 40; Exhibit E at ¶ 14; Exhibit B at ¶ 24.

21. Some religious call-outs, including Native American call-outs, also meet daily for smudging for about twenty minutes each day, unless the call-out already has another gathering that day. Exhibit C at ¶ 43; Exhibit E at ¶ 15; Exhibit B at ¶ 38.

22. The Native American call-outs additionally meet for sweat lodge ceremonies for four hours once a month, which occurs in place of their weekly gathering for that week. An additional 30 minutes is allowed to clean up after the ceremony. Exhibit C at ¶ 44; Exhibit E at ¶ 16.

23. Pow-wows are currently allowed for Native American call-outs for four hours in place of the call-out's sweat lodge ceremony for that month. Exhibit C at ¶ 45.

24. Native American call-outs also occasionally meet for passing ceremonies and healing ceremonies, which have been permitted during daily smudging times or sometimes as separate ceremonies during the week. Currently, they occur during daily smudging sessions, with the time for those sessions extended as needed. Exhibit E at ¶ 17; Exhibit C at ¶ 100.

25. Each religious call-out is permitted up to four special meals per year for religious holidays. Special meals occur during the call-out's weekly gathering time (or during one of the call-out's weekly gathering times if it has two). Exhibit D at ¶¶ 39, 41; Exhibit C at ¶¶ 65, 67.

26. Since at least September 2023, Nature-based call-outs are currently permitted to grow sage on their religious grounds. Exhibit C at ¶ 46.

27. Nature-based call-outs also perform maintenance on their religious grounds in small groups during scheduled times outside of the times for that call-out's religious activities. This occurs periodically from April to September. Exhibit C at ¶ 47; Exhibit B at ¶ 36.

*Defendants*

28. Laura Howard is the Secretary of KDADS. She joined the agency in January 14, 2019. KDADS, Meet the Secretary & Deputy Secretary (last visited September 8, 2023), https://kdads.ks.gov/about-kdads/meet-the-secretary.

29. Lesia Dipman has been the superintendent of LSH since May 2019, although she will be retiring effective September 15, 2023. Previously she was the acting superintendent from February 2019 to May 2019. Exhibit A at ¶¶ 1-4, 10.

30. Jeff Brown has been the chaplain at LSH since about 2014. Exhibit C at ¶¶ 1-2, 5.

31. Haleigh Bennett is the chief operations officer for LSH. She assumed this position in August 2022. Before then she served as the interim administrative program director for SPTP at LSH from February 2022 to August 2022 and as the SPTP program manager at LSH between December 2016 to February 2022. Exhibit D at ¶¶ 1-5, 7-14.

32. Linda Kidd has been the SPTP program leader at LSH since about 2015. Exhibit E at ¶¶ 1-2, 4-8.

*COVID-19*

33. The Center for Disease Control ("CDC") states:

> COVID-19 is a respiratory disease caused by SARS-CoV-2, a coronavirus discovered in 2019. The virus spreads mainly from person to person through respiratory droplets and small particles produced when an infected person coughs, sneezes, or talks. The virus spreads readily in crowded or poorly ventilated indoor settings. Illness can range from mild to severe, though not everyone infected with the virus develops symptoms. Adults 65 years and older and people of any age with underlying medical conditions are at higher risk for severe illness.

*See* CDC, Coronavirus Disease 2019 (COVID-19), https://web.archive.org/web/20230513232149/https://www.cdc.gov/dotw/covid-19/index.html (archived by the Internet Archive on May 13, 2023).

34.  COVID-19 is a highly contagious and deadly disease that has claimed the lives of over 1 million Americans. CDC, COVID Data Tracker (data through September 2, 2023), https://covid.cdc.gov/covid-data-tracker/#datatracker-home. In Kansas, as of May 31, 2023, there have been 946,564 reported cases of COVID-19 infections, with 10,229 deaths. Kansas Department of Health and Environment (KDHE), COVID-19 Cases in Kansas (updated May 31, 2023), https://www.coronavirus.kdheks.gov/160/COVID-19-in-Kansas. In Pawnee County, where the LSH campus located, there have been 2,556 reported cases and 24 deaths as of July 23, 2023. USAFacts, Pawnee County, Kansas coronavirus cases and deaths (updated July 23, 2023), https://usafacts.org/visualizations/coronavirus-covid-19-spread-map/state/kansas/county/pawnee-county. And the data reflects that the cases and deaths in Kansas continue in 2023. *See* KDHE, COVID-19 Cases in Kansas (for data on deaths in 2023, select "Death Summary").

35. The United States Department of Health and Human Services declared a public health emergency for COVID-19 beginning on January 27, 2020 and, on March 12, 2020, Governor Laura Kelly declared a Kansas State of Emergency from the COVID-19 Pandemic. By March 24, 2020, the Governor had issued an order prohibiting mass gatherings of 10 or more people. *See* Kansas Executive Order No. 20-14, available at https://governor.kansas.gov/wp-content/uploads/2020/03/EO-20-14-Executed.pdf.

36. To date, LSH has had over 550 positive cases of COVID-19 among staff members and over 400 positive cases of COVID-19 among patients and residents. One staff member has died from COVID-19 and four patients/residents have died from COVID-19. Exhibit A at ¶ 15; Exhibit C at ¶ 33.

37. Defendant Dipman facilitated meetings with LSH leadership regarding how to keep COVID-19 from spreading within the hospital. Exhibit A at ¶ 16.

38. LSH activated its Emergency Operations Plan on or about March 16, 2020, shortly after Governor Laura Kelly issued an emergency declaration for the state of Kansas in response to the COVID-19 pandemic on March 12, 2020, and soon after LSH created a plan known as a "Pandemic Preparedness Plan" or a "Pandemic Active Infection Plan" (hereinafter "Plan"). Exhibit A at ¶ 17.

39. The Plan addressed how to best avoid and manage COVID-19 transmission and infection at LSH. The plan was updated and modified over time. Among many other items, the plan listed restrictions on group activities of LSH visitors, staff, patients, and residents. The restrictions were religion neutral, both as to religion generally and as to any particular religion. The scope of the restrictions has varied depending upon active COVID-19 cases in Pawnee County, surrounding counties, and the state, and active COVID-19 cases among LSH staff, patients, and residents. LSH moved in and out of different defined phases. However, residents have always been permitted to conduct individual religious services regardless of the phase. Exhibit A at ¶ 18.

40. Over time COVID-19 restrictions were loosened or retightened to respond to infection levels at LSH, within Pawnee County, or within surrounding counties or the state. "Social distancing," in the various phases, meant maintaining six feet of separation during all activities. In all phases, resident units quarantined when someone in that unit tested positive for COVID-19. Exhibit A at ¶¶ 19-20; Exhibit D at ¶¶ 19-22, 24; *see also* Exhibit C at ¶¶ 35, 38, 51-52, 54.

    a. From March 18, 2020 to June 5, 2020, group activities at LSH were suspended. This phase was called "phase A." Residents were allowed to participate only in socially distanced "fresh air breaks" in small groups of less than ten residents.

    b. From June 6, 2020 to June 10, 2020, group activities of 15 people or less were permitted for a period of thirty minutes, with "social distancing" and masks. This did not include sweat lodge or pipe ceremonies because the required social

    distancing and masking was not possible during those ceremonies. This phase was called "phase B."

    c.   From June 11, 2020 to July 17, 2020, group activities of 30 people or less were permitted for a period of one hour, subject to the conditions in phase B. This phase was called "phase C."

    d.   Between July 18, 2020 to July 31, 2020, again all group activities at LSH were suspended (phase A).

    e.   Between August 1, 2020 to August 24, 2020, phase C was implemented again.

    f.   Between August 25, 2020 to September 11, 2020, again all group activities at LSH were suspended (phase A).

    g.   Between September 12, 2020 to October 8, 2020, phase B was implemented.

    h.   Between October 9, 2020 to November 17, 2020, phase C was implemented.

    i.   Between November 18, 2020 to January 15, 2021, group activities were suspended (phase A).

    j.   Between January 16, 2021 to February 26, 2021, phase B was implemented but with one-hour group activities instead of just 30 minutes.

    k.   Between February 27, 2021 to April 16, 2021, phase C was implemented, with the groups limited to 10 persons.

    l.   From April 17, 2021 to June 14, 2023, the active phase was generally in place without limitation on numbers of persons. However, social distancing and masking continued to be required.

    m.   As of June 14, 2023, LSH no longer has a COVID-19 Phase Plan.

    n.   From February 4, 2023, to present, religious call-outs have had two hours per week for weekly group activities.

41. As the hospital lessened many restrictions, the hospital remained cautious with regard to COVID-19. Low staffing, which could be made even lower by an outbreak of COVID-19, continued to be part of the reason for that caution. Exhibit D at ¶ 23.

42. The Plan was a product of the collaboration of a "Core Pandemic Planning Team," composed of Infection Control Preventionist, Chief Medical Officer, Primary Care Physician, Chief Nursing Officer, Assistant Superintendent, Superintendent, Environmental Safety Officer, a Clinical Program Director and Assistant Directors of Nursing. Dipman was a member of this core team. Defendants Haleigh Bennett, Jeff Brown, Laura Howard, and Linda Kidd were not members of this team. The team met frequently and oversaw the full Pandemic Planning for LSH. The team continued meeting until June 2023. Exhibit A at ¶ 21.

43. In addition, a "Large Pandemic Planning Team" was formed that met almost daily initially, then about weekly, and less often as the pandemic moved along, for information sharing, troubleshooting, questions/answers and the like regarding the pandemic response at LSH. This larger team was made up of all members of LSH leadership, including Lesia Dipman, Haleigh Bennet, Jeff Brown, and Linda Kidd. Defendant Laura Howard was not a member of this team. This team continued meeting until December 2021. Exhibit A at ¶ 22; Exhibit C at ¶ 37; Exhibit D at ¶ 25.

44. In designing the scope and application of restrictions and measures because of COVID-19, LSH had to account for the fact that (1) patients and residents, along with LSH staff, are often in close proximity to each other and necessarily confined to relatively small areas within LSH's buildings and (2) many of LSH's patients and a large number of the SPTP residents have a higher risk of serious complications and even death from COVID-19 infection than general populations because of their preexisting health conditions and age. Exhibit A at ¶ 23; Exhibit D at ¶ 16.[2]

45. In formulating the Plan, the Core Pandemic Planning Team relied on the advice and counsel of LSH's medical professional staff and recommendations about precautions and personal protective equipment from the Kansas Department of Health and Environment (KDHE), the Centers for Disease Control and Prevention (CDC) and the World Health Organization

---

[2] A CDC publication states: "Certain underlying health conditions you have (for example, obesity or chronic obstructive pulmonary disorder) may affect your risk of becoming very sick if you get COVID-19. Often, the more health conditions you have, the higher your risk. Certain conditions increase your risk more than others. For example, severe heart disease increases your risk more than high blood pressure." CDC, Factors That Affect Your Risk of Getting Very Sick from COVID-19 (updated May 11, 2023), https://www.cdc.gov/coronavirus/2019-ncov/your-health/risks-getting-very-sick.html.

(WHO). It also received advice from the Kansas Department of Administration and KDADS. Exhibit A at ¶ 24.

46. Defendant Howard did not participate in decisions on COVID-19 restrictions at LSH. Exhibit A at ¶ 25.

### Religious Policies

47. From 2018 to August 2023, LSH worked on revising its religious policies, which included working through various logistical issues. Since at least September 2022, these meetings occurred approximately every week. Exhibit A at ¶¶ 26-29; *see also* Exhibit B at ¶ 14; Exhibit C at ¶ 8; Exhibit D at ¶¶ 30-31; Exhibit F at ¶ 14.

48. One priority in the review of LSH's religious policies was to treat the religious call-outs in a balanced manner. Most, if not all, religious call-outs would like to meet for longer or more often, so when considering a requested time increase by a religious call-out, LSH considered whether it could accommodate that time increase for all religious call-outs. If not, that weighed against LSH accommodating that time increase. Exhibit D at ¶ 35.

### Meetings with Religious Leaders

49. Since about September 2022, Defendants Rop and Brown met with leaders of religious call-outs within SPTP once a week. Several times they were joined by Dipman as well. Exhibit B at ¶¶ 15-17, 19-20; Exhibit A at ¶ 30.

50. They did this because LSH and SPTP leadership are committed to working with religious leaders and to allow religious activities within the limitations imposed by physical structures, applicable law, administrative regulations, LSH policies, staffing levels, operational needs, safety and security concerns, treatment goals, the mission of LSH, and within budgetary limitations. Exhibit A at ¶ 31.

51. When Native American call-outs were increased to two hours in February 2023, the Christian groups wanted bible studies, so they were allowed one hour for group bible study during the week in addition to their one-hour weekend gathering. Exhibit B at ¶ 21.

*Pipes*

52. LSH has a Tobacco Free Hospital policy. Accordingly, use of tobacco during religious ceremonies has been limited to patients/residents in an approved outdoor area. Exhibit C at ¶ 55.

53. In 2020, Brown received purchase requests by residents to purchase individual prayer pipes (also called ceremonial pipes or "the sacred pipe"). These requests were not denied, but rather were put on hold while figuring out the logistical details of how to make the pipe ceremonies work within the limitations faced by LSH, including limitations regarding staffing, safety, and security, and the prevention of the spread of COVID-19 within the hospital. Exhibit C at ¶ 56; Exhibit D at ¶ 29.

54. In March and April of 2021, LSH/SPTP adopted a policy that one prayer pipe could not be smoked by multiple participants of a pipe ceremony. Instead, residents were required to supply their own pipe. Residents in Native American call-outs are permitted to purchase prayer pipes for their individual use during their weekly gatherings or other ceremonies involving smoking. The policy forbidding sharing of pipes was in place to reduce the risk of transmission of communicable diseases within the hospital as recommended by LSH's medical professional staff. Exhibit C at ¶ 57; Exhibit D at ¶ 28.

55. Pipe-and-drum ceremonies have been permitted with individual pipes since April 29, 2021. Exhibit C at ¶ 58.

56. For Native American ceremonies that include smoking, such as a weekly pipe-and-drum ceremony, staff retrieves the residents' individual prayer pipes, the tobacco, and a lighter, from secure areas and delivers them to residents to use under supervision. Exhibit C at ¶¶ 59, 61-62.

57. The pipes are stored in clear plastic containers, so staff does not have to directly touch the pipes. This is in deference to requests by the Native American call-outs that only certain people can handle prayer pipes and tobacco. Residents see the pipes and tobacco as sacred and believe that other staff touching those materials may spiritually contaminate them. Exhibit C at ¶ 60.

58. Thayer acquired and used his own individual prayer pipe. Therefore, Thayer has been and is permitted to engage in group pipe-and-drum ceremonies and other ceremonies including smoking using his own pipe when not prevented by COVID-19 protocol or other exigent circumstances. Exhibit C at ¶ 63.

59. LSH also granted numerous other property variances for Thayer from March 2020 to August 2022. Exhibit D at ¶ 26-27. Property staff has also helped Thayer move religious property to the assembly yard. Exhibit E at ¶ 38.

60. Since at least September 2023, group prayer pipes have been allowed again, with each individual allowed to decide whether to use an individual prayer pipe or a group prayer pipe. The resident designated as pipe keeper for each Native American religious call-out keeps the group prayer pipe in that resident's room, who brings it to the relevant ceremonies. Individual prayer pipes are only retrieved by staff for those residents who choose to use an individual prayer pipe. Tobacco and a lighter are still delivered by staff. Exhibit C at ¶ 64; Exhibit B at ¶ 37.

*Smudging*

61. Effective March 30, 2020, SPTP adopted a policy that allowed residents in the Native American religious call-outs to purchase and use "liquid smudge," a smokeless smudge spray, in lieu of their normal smudging practice, which involves burning sage. Exhibit C at ¶¶ 48-49.

62. Effective June 6, 2020, SPTP allowed daily non-liquid smudging, including the burning of sage, at weekly religious gatherings, during daily fresh-air breaks, and later as a separately scheduled daily activity. Exhibit C at ¶ 50; Exhibit B at ¶ 38; Exhibit E at ¶ 15.

*Sweat Lodge*

63. As of March 2020, two sweat lodges had been constructed at Dillon in the designated plots for the Native American call-outs identified as Red Wolf and Grey Wolf. Exhibit C at ¶ 74.

64. There has never been a separate sweat lodge at Dillon for the Independents, which is a small group of residents that split off from the Grey Wolf group. Due to space limitations, the Independents call-out does not currently have a designated area of the assembly yard, but is permitted by the Grey Wolf call-out to join them and use their sweat lodge for the sweat lodge ceremony. Exhibit C at ¶ 75.

65. Sometime in 2020, the sweat lodges at Dillon deteriorated from exposure to the elements so they had to be removed. Exhibit C at ¶ 76; Exhibit D at ¶ 56; Exhibit B at ¶ 42.

66. Sometime in 2020, some items and tools related to the sweat lodge ceremony were taken off Dillon building at one point as no one claimed them or could provide documentation detailing they had ownership over the items, they were not properly inventoried or accounted for, and some of the items posed a safety and security threat when so unaccounted for due to their potential to conceal individuals or be used as weapons. Exhibit D at ¶ 57.

67. Once weekly religious gatherings and smudging were allowed, the sweat lodge ceremony still did not occur due to the lack of a sweat lodge, the inability to maintain social distancing and masking inside a lodge, staffing and scheduling limitations, occasional county burn bans, and a reevaluation of safety and security concerns regarding the sweat lodge ceremony. Exhibit D at ¶¶ 58-61; Exhibit B at ¶¶ 43-49; Exhibit C at ¶¶ 73, 85.

68. Eventually, in early 2023, the decision was made to rebuild the sweat lodges and resume the sweat lodge ceremonies. The risks associated with COVID-19 had sufficiently abated. Staffing levels had increased. Shortening the sweat lodge ceremonies to four hours alleviated some scheduling issues. No burn bans were then in effect. And LSH's reevaluation of safety and

security concerns associated with sweat lodges had sufficiently completed and been addressed in appropriate procedures. Exhibit D at ¶ 62; Exhibit B at ¶ 50.

69. Each sweat lodge's frame at Dillon is built out of approximately eighteen individual willow branches, each at least one inch in diameter and about eight feet long. During ceremonies, it is covered with a tarp, with one door. The lodge is approximately four to five feet tall. The diameter of a lodge at Dillon is approximately six to seven feet. Exhibit C at ¶¶ 78-79, 81.

70. Inside the lodge during ceremonies, water is poured over heated stones in an earthen pit in the center to generate steam, which has an effect similar to a sauna. The stones themselves are heated in a fire built outside the lodge and are moved from the fire outside the lodge into the pit within the lodge using a tool such as a rake or a modified pitchfork (with a metal bar welded across the points to prevent it from stabbing anyone). High temperatures are produced in the confined interior space. Multiple individuals enter and stay in the lodge, mostly unclothed, for an extended period during a sweat lodge ceremony. Exhibit C at ¶¶ 80, 82.

71. The necessary willow branches are not available to order and are difficult to harvest. In 2020 and 2021, Brown had medical issues and multiple surgeries that made and continue to make it difficult for him to gather the willow branches for sweat lodges. Exhibit C at ¶¶ 83-84.

72. In 2023, when COVID-19 protocols loosened enough to allow a sweat lodge ceremony, the willow materials necessary for any reconstruction of the sweat lodges were not available for harvest until late spring. Exhibit C at ¶ 86; Exhibit D at ¶ 63; Exhibit B at ¶ 51.

73. Brown occasionally consults with a Native American advisor outside of LSH. This advisor referred LSH to an outside person who was able to gather willow branches for LSH in April 2023. Exhibit C at ¶ 87.

74. Using those willow branches, The Native American call-outs constructed two sweat lodges in April 2023, one on Red Wolf's designated grounds and one on Grey Wolf's designated grounds. Staff supervised the construction and provided the residents with access to the needed tools, including shovels and scissors. Exhibit C at ¶ 88; Exhibit D at ¶ 63; Exhibit B at ¶ 52.

75. Native American call-outs resumed monthly sweat lodge ceremonies in May 2023. These call-outs are permitted four hours for the sweat lodge ceremony each month. Exhibit C at ¶ 90; Exhibit E at ¶ 16; Exhibit D at ¶ 63; Exhibit B at ¶ 52.

76. An image of the current sweat lodges at Dillon can be seen in Exhibit C at 25.

77. Due to security concerns, certain protocols are in place. Residents who are on security-risk status may not participate in sweat lodge ceremonies. When sweat lodge ceremonies occur, residents are strip searched before and after the ceremony. Location checks occur every thirty minutes, for which residents must exit the sweat lodge to be counted after completing that round of sweating. Residents must wear shorts at a minimum during the ceremony. If residents need to use the bathroom, residents must do so one at a time and the bathroom is searched before and after each use. Exhibit D at ¶ 64.

### Burn Bans

78. At Dillon, the outdoor smudging ritual conducted by members of Native American religious call-outs involves the practice of open burning of dried herbs. Exhibit D at ¶ 65.

79. At Dillon, the ceremonial use of pipe(s) by members of Native American religious call-outs involves smoking tobacco and, therefore, the risk of causing a fire associated with any kind of smoking. Exhibit D at ¶ 66.

80. Due to a lack of moisture or fire hazard conditions, from time to time, the Board of County Commissioners of Pawnee County imposes a burn ban for the county, which places restrictions on outdoor burning. Exhibit D at ¶ 67.

81. LSH previously interpreted the burn bans to prohibit outdoor smoking and non-liquid smudging. Exhibit D at ¶ 68.

82. During parts of 2021 and 2022, residents at Dillon were not allowed to smudge (other than by liquid smudging) or smoke pipes during burn bans in compliance with LSH's understanding of the Pawnee County burn bans. As a result, Thayer was not allowed to engage in non-liquid smudging or engage in the smoking portion of the pipe-and-drum ceremony between July 20, 2022, and September 10, 2022. Exhibit D at ¶ 69.

83. LSH's strict response to the burn bans was more than just recognition of the county-imposed rule as perceived by LSH. Larned only has volunteer firefighters, and while LSH has its own fire engine on the hospital's site, there was a period of time when the fire truck was out-of-service, including from at least May 2022 to September 9, 2022. Both the lack of full-time firefighters in Larned and the lack of a working fire engine on campus would result in an increased response time in event of a fire on campus. Moreover, in March 2022, a large wildfire broke out in the Larned area that threatened LSH's property, coming within 5 miles of LSH. In light of these considerations, LSH's strict response to burn bans was for the safety of its patients, residents, and staff, to protect the LSH facilities, and to protect the public from any escapes that may occur due to a fire damaging LSH's security measures. Exhibit D at ¶ 70; Exhibit B at ¶ 46; Exhibit C at ¶¶ 92-94.

84. However, with an interpretation of the county ban from Pawnee County officials and the completed repair of LSH's fire engine, outdoor pipe and non-liquid smudging ceremonies have been permitted even during a burn ban since September 11, 2022. County officials have clarified that the burn ban does not itself prohibit outdoor smudging or smoking provided the materials are used and disposed of with care and in a manner to reduce the potential for fires. When a burn

ban is in effect, staff now ensures that there is a bucket of sand and either a bucket of water or a garden hose ready and attended by a staff member at the smudging or smoking location to enable a quick response to any out-of-control fires that may occur. Additionally, safety-and-security staff waters the grounds with sprinklers before ceremonies involving smoking to reduce the risk of fire. Exhibit D at ¶ 71.

85. Because sweat lodge ceremonies involve an open fire, they continue to be prohibited during a burn ban. Exhibit D at ¶¶ 60, 72; Exhibit A at ¶ 35; Exhibit B at ¶ 45; Exhibit C at ¶ 91.

### *Special Meals*

86. Currently, the cafeteria is not open and residents eat in their rooms or in a commons area on their living unit. This was previously to prevent the spread of COVID-19. The cafeteria room was not large enough to accommodate social distancing and the required masking was not possible while eating. Since June 2023, LSH has been working on the logistics of re-opening the cafeteria. Turnover in staff resulted in some institutional knowledge being lost regarding how to fully re-open the cafeteria, but those issues are now being worked through. Exhibit D at ¶ 38.

87. Special meals have been permitted again since at least March 2023. Each religious call-out is permitted up to four special meals per year for religious holidays. Exhibit D at ¶¶ 39-40; Exhibit C at ¶¶ 65-66.

88. Special meals occur during the call-out's weekly gathering time (or during one of the call-out's weekly gathering times if it has two). Exhibit D at ¶ 41; Exhibit C at ¶ 67.

89. Special meals with food appropriate for the religious holiday are provided by LSH's food services contract provider to members of religious call-outs in individual servings. Exhibit D at ¶¶ 42-44; Exhibit C at ¶¶ 68-69; Exhibit B at ¶ 22.

90. Special meals for the Native American call-outs are held outside in the assembly yards. Exhibit D at ¶ 45; Exhibit C at ¶ 70.

91. To prevent the spread within the hospital of infections and disease, meals, including holiday meals, cannot be served "family style." Exhibit D at ¶¶ 46-47; Exhibit C at ¶¶ 71-72; Exhibit B at ¶ 22.

92. Residents are not permitted to prepare their own food for special meals because they are not equipped to properly prepare it so that the food is maintained at proper temperatures and is safe for consumption. When residents prepared their own food in the past, it was not maintained at proper temperatures, which rendered it unsafe for consumption. Exhibit D at ¶ 48.

93. LSH does not have the food budget to pay extra costs for special meals beyond the normal daily meal rate per resident. LSH cannot preferentially subsidize the exercise of religion by paying more for Native American special meals than it already pays for residents' usual daily meals. Any additional cost of special meals would have to be borne by residents or outside donors, with LSH's contribution limited to what it does not pay to offer usual daily meals on the day of the special meal. Exhibit D at ¶¶ 49-50.

94. There has not been a time where residents could not eat religious meals in their room, by themselves. Exhibit D at ¶ 51.

### Passing and Healing Ceremonies

95. Residents in Native American call-outs may request to conduct a healing ceremony when someone close to them is sick. Exhibit C at ¶ 95.

96. Residents in Native American call-outs may request to conduct a passing ceremony when someone close to them has died. Exhibit C at ¶ 96.

97. Healing and passing ceremonies include smoking a prayer pipe. Exhibit C at ¶ 97.

98. In the past, Native American religious call-outs have requested to smoke tobacco in "passing ceremonies" within twenty-four hours of the death of someone they know, and these were allowed in addition to smoking at weekly ceremonies. LSH had no way of verifying the

death or the patient's relationship to the deceased and so took the patient's word for it. Passing ceremonies then became requested so often that for periods of several weeks at a time they would happen more days than not, which interfered with scheduling and staffing for treatment, medical appointments, and other primary operations of the facility. The high number of passing ceremonies requested also raised questions about the sincerity of that many requests for passing ceremonies. Exhibit D at ¶ 52.

99. Since April 29, 2021, when the policy was finalized for allowing individual pipes, healing and passing ceremonies have been allowed as part of the weekly gatherings of Native American religious call-outs. Exhibit C at ¶ 98; *see also* Exhibit B at ¶ 39; Exhibit D at ¶ 53.

100.    For a time, healing and passing ceremonies were only allowed as part of the weekly gatherings due to limited staffing as well as logistical issues, including concerns raised by clinical staff regarding scheduling conflicts with treatment sessions for residents in the past. Further, LSH did not have a way to determine which requests for passing ceremonies were sincere. Exhibit C at ¶ 99; Exhibit B at ¶ 40; Exhibit D at ¶ 54.

101.    Since at least November 8, 2022, passing ceremonies and healing ceremonies have also been permitted during daily smudging times or sometimes as separate ceremonies during the week. Currently, they occur during daily smudging sessions, with the time for those sessions extended as needed. Exhibit C at ¶ 100; Exhibit B at ¶ 41; Exhibit E at ¶ 17; Exhibit D at ¶ 55.

*Active Supervision Policies and Available Staff*

102.    SPTP policy sets the number of staff required for supervision of residents. The policy is primarily a product of LSH's nursing department's determination of the staff needed to safely monitor, provide care for, and treat residents, and to also maintain security and order. The fact that SPTP residents have been found to be violent sexual offenders in need of involuntary inpatient treatment is part of the staffing calculus. Exhibit E at ¶ 18.

103.     To avoid events adverse to safety and security, it is important not to stretch staffing too thin. Adequate staffing helps prevent or mitigate behavioral events, violence, cornering of staff, medical issues, contraband, manipulation of fences and barriers, elopements (escapes), and sexual activity. Residents are often aware of when staffing levels are lower than usual, and experience shows that adverse events occur more often when staffing levels are low in a particular area. For these reasons, it is important to keep staffing levels up not only for the religious call-outs but for other areas of LSH as well, such as in resident units and in transporting residents to medical appointments and treatment sessions. Exhibit D at ¶ 36.

104.     Under the SPTP policy, the number of staff necessary to supervise a call-out depends on the number of residents participating. The base requirement is 2 staff (MHDD's or transport staff) for supervision, with 3 or more staff required to supervise groups larger than 15. Exhibit E at ¶ 19; Exhibit F at ¶ 19; Exhibit B at ¶¶ 27-28; Exhibit C at ¶ 41.

105.     Regardless of the staff supervising the call-out, 2 or 3 transport staff are needed to securely transport residents to and from the call-out. Exhibit E at ¶ 20; Exhibit F at ¶ 19; Exhibit B at ¶ 29; Exhibit C at ¶ 41.

106.     In addition, when a shovel or rake are going to be used during a call-out, one of the staff members must be specifically trained in religious yards and tool control and must be present at all times. Exhibit E at ¶ 21; Exhibit C at ¶ 41.

107.     Religious gatherings are also monitored by safety and security officers (SSO's) by means of surveillance cameras. Exhibit B at ¶ 30.

108.     During times of low staffing, staff from other departments, such as transport staff or even management, have supervised religious call-outs although it was not one of their positions'

regular duties to ensure that religious call-outs occurred. Exhibit E at ¶ 23; Exhibit F at ¶¶ 16, 20; Exhibit A at ¶ 40; Exhibit C at ¶ 36.

109.    There have been times when there has not been enough staff to permit religious call-outs to meet. This happened (1) when insufficient staff was available to both supervise religious call-outs and supervise residents not at the religious call-outs **and** (2) when alternative staffing was not available, whether from other departments or from contract agencies. Exhibit E at ¶ 24.

110.    Weekday schedules are generally filled with meal times, medication runs, treatment sessions, and medical appointments. For this reason, religious call-outs and visitations generally occur on weekends, although some treatment sessions and medical appointments also occur on weekends. Exhibit E at ¶ 25; Exhibit B at ¶¶ 25-26.

111.    To reduce the risk of elopements (escapes) from the hospital, the yards are closed from 30 minutes prior to sunset until sunrise. Outdoor religious gatherings cannot be scheduled for when the yards are closed. Exhibit D at ¶ 37.

112.    The number of MHDD's required to supervise residents who do not attend the call-out varies by resident unit and current conditions and is determined by nursing staff. Exhibit E at ¶ 22.

113.    When a resident needs to go to a medical appointment, two or three transport staff are needed to transport the resident safely and securely. Exhibit E at ¶ 9.

114.    Based on current staffing levels, increasing the time for religious call-outs would necessarily reduce time for treatment sessions or medical appointments. Exhibit E at ¶ 26.

115.    LSH staff, including SPTP staff, are State of Kansas employees. They are hired by LSH and paid through state general funds. Funds for their salaries are appropriated by the Kansas

legislature and the pay rates are set by the department of administration. Exhibit A at ¶ 36; *see also* Exhibit G at 12.[3]

116.    LSH has experienced staffing troubles even prior to COVID-19. Being a rural location with low rates of unemployment in the LSH area adds to the difficulty of attracting adequate staffing. Exhibit A at ¶ 37.

117.    The staffing shortages have not been from a decision to reduce the number of hospital employees. Instead, LSH has had problems retaining, recruiting and hiring qualified employees to the Larned, Kansas hospital. Exhibit A at ¶ 38.

118.    The impact of the staffing situation worsened with the COVID-19 pandemic. When the COVID-19 pandemic first hit Kansas in March 2020, many LSH staff members walked away from their jobs and remained at home while continuing to remain in their positions, which lowered staffing levels at LSH. Exhibit A at ¶ 39; Exhibit C at ¶ 34; Exhibit F at ¶ 15.

119.    Based on Nursing Departmental data, as of September 2022, the SPTP nursing staff vacancy rate (for nursing positions assigned to SPTP units) was approximately 65-70%. MHDD's are included in that statistic. Exhibit A at ¶ 41.

120.    Based on Nursing Departmental data, as of September 2023, the SPTP nursing staff vacancy rate (for nursing positions assigned to SPTP units) remains in the range of approximately 65-70%. MHDD's are included in that statistic. Exhibit A at ¶ 42; *see also* Exhibit G at 6-7.

---

[3] The Court can take judicial notice of Exhibit G, a presentation given to the Kansas Legislature, which can be found on the Kansas Legislature's website, under Federal Rule of Evidence 201. *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007). *See* http://www.kslegislature.org/li_2022/b2021_22/committees/ctte_spc_2022_special_committee_on_state_employe_1/documents/testimony/20221129_06.pdf.

121.     LSH frequently pays overtime for staff to cover needed shifts. Overtime is paid at time and a half. Exhibit A at ¶ 43.

122.     Since August 2021, LSH has spent over a million dollars a month on contract nursing staff (also known as agency staff) to cover vacant positions. LSH has even had to increase the use of contract staff since August 2021, currently spending multiple millions of dollars a month on contract staff. Contract staff include registered nurses, licensed practical nurses, certified nurse aids, and patient care support staff. LSH's contractual services budget cannot cover this high cost, so additional funds come from the Kansas Department of Aging and Disability Services' (KDADS') Medicaid billing revenues and unspent State General Fund Balances in addition to a Governor's Budget Amendment providing additional funding because the other sources still do not provide enough funds to cover the cost. Exhibit A at ¶ 44.

123.     LSH will continue to address its staffing shortage in the future by continuing to focus on recruiting and retention efforts and working with KDADS. Exhibit A at ¶ 45; *see also* Exhibit G at 3-5, 8-10.

124.     Despite these efforts, occasionally group activities, including religious call-outs, have had to be cancelled because of staff shortages pursuant to policies requiring adequate staffing to supervise residents for those activities. Cancellations that occurred due to lack of adequate staffing were done for the safety of staff and residents, to maintain order, and for the safety and security of the facility. Exhibit A at ¶ 46.

*Cancellations and Lockdowns*

125.     For other reasons apart from the LSH's COVID-19 protocol and low staffing levels, weekly religious call-outs have occasionally been cancelled, and there have been occasions when residents have not been allowed to smudge outdoors or smoke for other reasons, such as extreme weather. Exhibit C at ¶ 53; Exhibit E at ¶¶ 40-44; *see also* Exhibit D at ¶ 73.

126.     From June 30, 2021, to July 1, 2021, LSH was on lockdown due to a possible elopement (escape). Due to a period of heightened security following the possible elopement, the following weekend, the weekend of July 3-4, 2021, all group activities such as classes, groups, and religious gatherings were suspended until relevant safety and security concerns could be investigated and addressed. After that, group activities resumed, so group religious gatherings occurred as usual the next weekend, the weekend of July 10-11, 2021. Exhibit F at ¶¶ 26-28.

127.     No softball games had been scheduled during the suspension of group activities the weekend of July 3-4, 2021. Softball began for the third quarter of the year on July 6, 2021, after the suspension of group activities had ended. The softball games no longer occur but used to have a staffing requirement of two to four leisure activity therapy staff and a driver. They required a different type staff than religious call-outs require. Exhibit F at ¶¶ 21-25, 29.

128.     A separate lockdown occurred on March 3, 2022, due to an electronics malfunction that resulted in potential security issues. Exhibit F at ¶ 30.

### *Visitations*

129.     Visitations provide an opportunity for guests to meet with residents. Exhibit D at ¶ 74; Exhibit E at ¶ 27.

130.     Visitations can take the form of an in-person visitation or a skype visitation. Both types of visitation require transport staff to transport the resident to the designated secure visitation location. Exhibit D at ¶ 75; Exhibit E at ¶ 28.

131.     If not enough transport staff are available for both religious call-outs and visitation on a weekend day, the religious call-outs generally would not be cancelled. The religious call-outs may be moved to another day or, more rarely, the call-outs may be shortened from an hour to forty-five minutes. Exhibit E at ¶ 29.

132.    Visitation is allowed each weekend if residents request it but does not occur every week because it is not requested every week. Exhibit E at ¶ 30.

133.    While COVID-19 pandemic procedures were in place, SPTP limited the amount and length of visitations. For example, in the fall of 2022, SPTP allowed only two visitors total for all of SPTP per week and allowed only two hours for each visitor. Exhibit E at ¶ 31.

134.    Religious call-outs are very rarely cancelled due to visitations, but on one particular day during the COVID-19 pandemic, when staffing was too low to permit both religious call-outs and a visitation that day, religious call-outs were cancelled in favor of the visitation. The guest for the visitation had driven for several hours to visit a resident and was going to drive several hours to go home the same day, so it would have been a considerable burden on that guest to prevent the guest from visiting the resident that the guest had travelled so far to visit. Exhibit D at ¶ 76.

### *Interrogatories*

135.    Thayer says that he could not engage in group pipe/tobacco and drum ceremonies because of staffing shortages on August 29, 2021 and March 3, 2022; and in group smudging prayer on November 15, 2020, August 29, 2021, October 7, 2021 and March 3, 2022. Exhibit H, answers to 2a, 3a, 5a, 6a.

136.    Asked to detail the principal and material facts for each individual defendant that Thayer claims show that the defendant violated his rights, Thayer's interrogatory answers assert:

  a.  Nothing about Defendant Howard. *See* Exhibit H.
  b.  Dipman had "foreknowledge" that Thayer was not given tribal religious meals and participated in cancelling the sweat lodge ceremony. *See* Exhibit H, answer to 1c, 4a.
  c.  Brown was responsible to provide the tobacco for the pipe-and-drum ceremony and for facilitating smudging. Exhibit H, answers to 2c, 4c, 5c.
  d.  Bennett's position in the SPTP hierarchy and her direct contact and direct communication with Tonya Taylor ("SPTP Program Administer [sic] Director")

and Dipman connect her to Thayer's denied smudging, sweat lodge ceremonies and other congregate religious services. Thayer says Bennett participated in cancelling the sweat lodge ceremony. Exhibit H, answers to 1c, 2c, 3c, 4a, 5c, 6c.

e. Kidd's position in the SPTP hierarchy and her direct contact and direct communication with Tonya Taylor and Bennett connect her to Thayer's denied religious meals, drum/pipe/tobacco ceremonies and other congregate religious services, Exhibit H, answers to 1c, 2c, 3c, 4c, 5c, 6c; and, further, Kidd scheduled call outs and SPTP staff for the call outs. *Id.*

## ARGUMENTS AND AUTHORITIES

### *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *McCoy*, 887 F.3d at 1044. "[W]hile courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). Facts must be shown through affidavits, deposition transcripts, or incorporated exhibits. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. [citation omitted] To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021).

### *Qualified Immunity Standard*

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Qualified immunity

is an affirmative defense that can be raised in a motion to dismiss or in a motion for summary judgment. *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). When a defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal statutory or constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.* "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The right must be clear from applicable case law, *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019), and must be defined with specificity, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

**I. The Court lacks subject-matter jurisdiction over Thayer's claims for monetary relief because of Eleventh Amendment immunity.**

**A. RLIUPA does not support claims for monetary damages.**

RLUIPA claims cannot be brought for monetary damages. *Sossamon v. Texas*, 563 U.S. 277, 293 (2011). Therefore, Thayer's monetary claims can only be brought under § 1983.

**B. Thayer's request for monetary damages under § 1983 is against Defendants in their official capacities.**

"The determination as to whether the state is the real party in interest depends on the type of relief sought. . . if the relief sought is to be money damages paid by the state, then the state is the real party in interest." *LaFavre v. Kansas ex rel. Stovall*, 6 F. App'x 799, 803 (10th Cir. 2001) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)). When "the relief sought is . . . money damages paid by the state" of Kansas then "the State of Kansas is the real party in interest" and the action is "brought against the . . . defendants in their official

capacities." *Id.* at 804. Here, the plaintiff "prays that this court . . . order the defendants to pay *through their representative agency* the following: a) 75,000.00 for punitive damages and b) 75,000.00 in compensatory damages." (Doc. 10 at 13 (emphasis added); *see also* Pretrial Order, Doc. 45 at 9 ("Monetary damages are requested from the Defendants' 'representative agency' (so against Defendants in their official capacities)").) Thayer only seeks damages collected from the state itself, which means his requests for damages are only against defendants in their official capacities, not their individual capacities.

### C. The Eleventh Amendment bars Thayer's § 1983 claims against Defendants in their official capacities for monetary damages.

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). State officials such as KDOC employees share the state's immunity from suits against them in their official capacities. *See id.; White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996). A narrow exception allows a plaintiff to seek prospective injunctive relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)). But claims for "retrospective declaratory relief" are barred. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

Here, Thayer requests prospective injunctive relief against Defendants, and this particular remedy is exempt from Eleventh Amendment immunity. (Doc. 45 at 9.) But Thayer also requests monetary damages in the form of compensatory and punitive damages (Doc. 45 at 9), which are barred by the Eleventh Amendment as asserted against Defendants in their official capacity. So

Thayer's claims against Defendants in their official capacities for monetary damages should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.

**II.** **Thayer's claims under RLUIPA for injunctive relief fail due to lack of a substantial burden and due to compelling government interests.**

For an RLUIPA claim, the plaintiff "must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010). Showing a substantial burden to religious exercise is a required element of both RLUIPA claims and Free Exercise Clause claims.[4] "[A]t a minimum the substantial burden test requires . . . more than an inconvenience to one's religious practice." *See Abdulhaseeb*, 600 F.3d at 1316. Government action which places a substantial burden on an individual's right to free exercise of religion is action that tends to coerce the individual to forego her sincerely held religious beliefs or to engage in conduct that violates those beliefs. *See id.* at 1315.

**A. Thayer's religious exercise is not substantially burdened by limiting sweat lodge ceremonies to four hours.**

Thayer requests injunctive relief requiring 8-hour sweat lodge ceremonies. (Doc. 45 at 9.) But "he has presented no evidence that insufficient time for the [ceremony] has substantially burdened his ability to freely exercise his religious beliefs." *Strope v. Cummings*, No. 06-3021-KHV, 2009 WL 484453, at *7 (D. Kan. Feb. 26, 2009). Thayer is able to participate in the sweat lodge ceremony once a month for several hours. Native American call-outs already receive more time for religious ceremonies than other religious call-outs. *See* Statement of Facts ¶¶ 22-25, 49.

---

[4] RLUIPA and Free Exercise Clause claims share the same substantial burden standard. *Blair v. Raemisch*, 804 F. App'x 909, 917 (10th Cir. 2020); *Tenison v. Byrd*, 826 F. App'x 682, 690-91 (10th Cir. 2020).

What is more, he requests more time than was allowed for the sweat lodge ceremony even before the COVID-19 pandemic. (*See* Doc. 10 at ¶ 35.) A slightly shorter time for the ceremony than Thayer prefers does not establish a substantial burden, and this injunctive relief should be denied.

**B. Thayer's religious exercise is not substantially burdened by not providing him with double portions of food for special meals.**

Thayer requests injunctive relief requiring double portions of food for special meals. (Doc. 45 at 9.) Yet Thayer has not alleged or established any religious belief that requires double portions of food as part of celebrating Native American religious holidays. Even if he had done so, providing only regular-sized portions of food does not substantially burden a person's religious celebration of a holiday, even if that holiday involves fasting during other parts of the day. *See Thompson v. Bukowski*, 812 F. App'x 360, 365 (7th Cir. 2020); *Givens v. Vaughn*, No. 16-cv-303, 2017 WL 892602, at *9 (S.D. Ill. Feb. 6, 2017). This relief should be denied.

**C. Any substantial burden on any sincerely held religious belief of Thayer's is justified by compelling government interests in meeting budgetary constraints, addressing limited staffing, and ensuring an orderly, simplified food service.**

For RLUIPA's "compelling governmental interest" standard, "context matters" when appropriately balancing the government's interest. *Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005). "Lawmakers supporting RLUIPA . . . anticipated that courts would apply [RLUIPA's] standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* at 723. Further, although RLUIPA covers "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A), the need to balance government interests against religious practices may be greater for optional practices than for mandatory practices. *Grayson v. Schuler*, 666 F.3d 450, 455 (7th Cir. 2012).

For food service specifically, the government has legitimate interests in "simplified food service" and "staying within the [facility's] budget." *Williams v. Morton*, 343 F.3d 212, 218 (3d Cir. 2003). A prison-like facility also has a "legitimate security justification" to limit or even cancel religious services when the facility is "short-staffed and [does] not have the personnel to safely transport prisoners and supervise gatherings" *McRoy v. Sheahan*, 205 F. App'x 462, 463-64 (7th Cir. 2006). And the SPTP program in particular has a compelling governmental interest in prioritizing treatment. *Beyer v. Deslauriers*, No. 17-3002-SAC, 2019 WL 2409603, at *3 (D. Kan. June 17, 2019) (quoting *Johnson v. State*, 289 Kan. 642, 650 (2009)).

Here, compelling government interests in ensuring security despite limited staffing and prioritizing time for treatment justify the four-hour time limit for sweat lodge ceremonies. And compelling government interests in meeting budgetary constraints and ensuring and orderly, simplified food service justify the regular-sized portions of food provided for religious meals.

### D. Any § 1983 claims on the same theories necessarily also fail.

If the RLUIPA claims fail, then any § 1983 claims based on the same theories also fail. *Dorman v. Aronofsky*, 36 F.4th 1306, 1313 (11th Cir. 2022); *see also Ramirez v. Collier*, 142 S. Ct. 1264, 1277 (2022) ("RLUIPA . . . . aim[s] to ensure greater protection for religious exercise than is available under the First Amendment."). Therefore, for the reasons above, Thayer cannot recover under § 1983 for sweat lodge ceremonies being limited to four hours or Thayer not being provided with double portions of food for religious meals.

### III.   Thayer fails to establish the personal participation of the Defendants.

"Liability under § 1983 requires personal participation in the unlawful acts." *Beedle v. Wilson*, 422 F.3d 1059, 1072 (10th Cir. 2005). So Thayer cannot rely on vicarious liability, but must show: "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

Thayer must also show these elements for his RLUIPA claims. *Ciempa v. Jones*, 745 F. Supp. 2d 1171, 1200 (N.D. Okla. 2010); *see also Wilkinson v. Sec'y*, 622 F. App'x 805, 812 (11th Cir. 2015) (finding claims to be "cognizable" under RLUIPA because they "were predicated on a theory of direct liability rather than of vicarious liability").

Here, Plaintiff's individual capacity theory breaks down on the first prong.[5] Accordingly, summary judgment is proper against each individual capacity claim. When asked to detail the principal and material facts for each individual defendant that Thayer claims show that the defendant violated his rights, Thayer's interrogatory answers asserted nothing at all about Laura Howard. And for the others, Thayer's answers asserted only that the Defendants had minimal involvement if any in the decisions to restrict most religious ceremonies. Knowledge of restrictions and communicating with other staff is not the same as causing the restrictions.

## IV. Thayer's free exercise rights have not been violated according to any clearly established law, so qualified immunity bars any § 1983 individual capacity claims.

Defendants assert the qualified immunity defense to Thayer's individual capacity claims. This requires Thayer to show "a violation of a constitutional right," and demonstrate "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Defendants are entitled to qualified immunity because there was no clearly established law within this Circuit, or a robust consensus of cases outside of it, that their alleged actions violated clearly established law, particularized to the facts of this case. Specifically, Thayer has not shown any law that put Defendants on notice that restricting all

---

[5] *See, e.g., Wilkins v. Wolf*, No. 1:20-CV-2450, 2021 WL 2376678, at *4 to *5 (M.D. Pa. June 10, 2021) (dismissing claims against individual defendants concerning measures taken by the Department of Corrections in response to the COVID-19 pandemic for lack of "personal involvement").

group activities due to COVID-19, low staffing levels, etc., violated Thayer's rights. Because qualified immunity applies, the Court should grant summary judgment to Defendants.

**A.  The restrictions on group activities were neutral, generally applicable, and rational.**

Laws or policies "incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021); *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422-23 (2022). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* at 1877. Government fails to act in a generally applicable manner when it "decides the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542-43 (1993). When a law is neutral and generally applicable, rational-basis deference applies, under which the question becomes whether the law "rationally relates to a legitimate government interest." *Harmon v. City of Norman*, 61 F.4th 779, 794 (10th Cir. 2023).

All of the various restrictions on religious ceremonies at LSH were and are neutral to religion and are generally applicable, whether due to COVID-19, insufficient staffing, burn bans, or other reasons. They applied equally to every other group activity, such as SPTP group therapy.

As can be seen in the statement of facts, the various restrictions on group activities (including religious activities) in SPTP were rationally related to legitimate interests, including:

- Maintaining safety, security, and order[6];
- Maintaining health and safety by preventing the transmission and spread of disease, especially COVID-19, within the hospital[7];

---

[6] *See Hammons v. Saffle*, 348 F.3d 1250, 1254-55 (10th Cir. 2003) ("maintaining prison order and safety"); *Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005) (quoted above).
[7] *See, e.g., United States v. Hicks*, No. 20-20024-JAR-1, 2020 WL 1528619, at *2, (D. Kan.

- Addressing the practical realities of low staffing levels and scheduling limitations[8];
- Prioritizing providing treatment to residents[9];
- Ensuring safety and security from fires during a burn ban[10];
- Ensuring "safe and efficient food preparation and delivery to inmates"[11]; and
- Minimizing people's "travel time"[12].

All of the challenged restrictions were neutral, generally applicable, and rational, so they

qualify for and satisfy rational basis scrutiny under the First Amendment.

**B. The restrictions on group activities did not substantially burden Thayer's religious exercise.**

Even if any of the restrictions were not neutral or generally applicable, many, if not all, of

---

March 31, 2020) (finding that suspending all social visitations in response to COVID-19 "comports with the factors laid out in *Turner*" and "does not represent an exaggerated response to this global pandemic; it comports with the serious nature of a public health crisis"); *MacDonald v. Harold*, No. 6:20-cv-00931, 2022 WL 205671, at *6 (D. Or. Jan. 24, 2022) ("suspension of in-person religious services was rationally related to the legitimate goal of preventing the spread of COVID-19 and was not an unreasonable or exaggerated response"); *Burrage v. Lee Cnty.*, No. 1:20-CV-00180, 2021 WL 1343510, at *1 (N.D. Miss. Mar. 23, 2021) (finding that restricting access to visitors, including religious leaders, was constitutional because "without question, taking such precautionary measures to prevent (and protect against) the spread of COVID-19 within [the jail] facility constitutes a legitimate penological objective"); *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (emphasizing the seriousness of possible transmission of COVID-19 in a prison setting and the health risks to those who contract the disease).

[8] *McRoy v. Sheahan*, 205 F. App'x 462, 463-64 (7th Cir. 2006) (finding a "legitimate security justification" for cancellation of religious services when a prison "was short-staffed and did not have the personnel to safely transport prisoners and supervise gatherings").

[9] *Beyer v. Deslauriers*, No. 17-3002-SAC, 2019 WL 2409603, at *3 (D. Kan. June 17, 2019) (quoting *Johnson v. State*, 289 Kan. 642, 650 (2009)) (saying in the context of the SVP program, "This 'compelling . . . interest in *providing treatment* and protecting the public prevails over the individual's interest in being free from compulsory confinement'" (emphasis added)).

[10] *Brower v. Nuckles*, 182 F.3d 916 (table opinion), 1999 WL 435173, at *2 (6th Cir. 1999) ("the legitimate penological interest of prohibiting fire hazards").

[11] *Baalim v. St. Louis City Justice Center*, No. 4:22-CV-359, 2022 WL 2237335, *6 (E.D. Mo. June 22, 2022).

[12] *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 557 (3d Cir. 2011). Just as schools can consider minimizing travel time for their students, so too LSH can consider minimizing travel time for guests to its facility.

the burdens have been limited, not substantial. Only the manner of his exercise was modified by the necessary response to COVID-19 and other circumstances. He has always been permitted to worship individually. When he could not burn dried herbs or resins to smudge, he was permitted to use liquid smudge. LSH policy also permits (and permitted) Thayer to acquire and use a personal ceremonial pipe in place of a group pipe. Most importantly, Thayer presents no evidence suggesting burdens to his religious exercise that he has asserted have coerced him to forgo sincerely-held beliefs or engage in conduct contrary to his beliefs.[13]

## C. The restrictions on group activities were not undertaken with the required subjective intent.

To establish a § 1983 claim for a Free Exercise violation and receive monetary damages (which are not available under RLUIPA[14]), the Tenth Circuit has left open the question of whether the plaintiff must show discriminatory purpose,[15] which has not been shown here. To show discriminatory purpose, Thayer must show defendants "adopted and implemented the . . . policies at issue not for a neutral . . . reason but for the purpose of discriminating on account of . . . religion."[16] Even if a "discriminatory purpose" need not be shown, the law was not clearly established that anything less would result in a constitutional violation. Thayer has not alleged

---

[13] *See e.g., Mathes v. Carlson*, 534 F. Supp. 226, 228 (W.D. Mo. 1982) (citing *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972)) (noting defendants did not violate the First Amendment by refusing to allow the plaintiffs to have medicine bundles and a sweat lodge where plaintiffs were allowed to reasonably practice their religion otherwise); *see also MacDonald v. Harold*, No. 6:20-CV-00931, 2022 WL 205671, at *6 (D. Or. Jan. 24, 2022) (finding inmate's right to religious freedom was not abridged by COVID-19 policy that prohibited in-person social visitation and religious services because access to recorded services were provided and there was no evidence plaintiff was coerced to forgo sincerely-held beliefs or engage in conduct contrary to his beliefs).
[14] *Sossamon v. Texas*, 563 U.S. 277, 293 (2011).
[15] *Ralston v. Cannon*, No. 19-1146, 2021 WL 3478634, at *5 to *6 (10th Cir. 2021) [hereinafter *Ralston II*] (citing *Ralston v. Cannon*, 884 F.3d 1060, 1063 n.3 (10th Cir. 2018) [hereinafter *Ralston I*]).
[16] *Ralston I*, 884 F.3d at 1063 n.3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

any facts showing a discriminatory purpose.

Here, it is obvious the limitations on Thayer's activities were not to discriminate against him on account of his or anyone's religion. Thayer does not identify any facts which might support the individual defendants acted with a discriminatory purpose. Alternatively, Thayer has also not proven the potentially lower standard of "conscious or intentional interference" with his free exercise rights.[17]

### D. The restrictions on group activities were reasonably related to legitimate penological interests.

Even "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). This rule has been applied to the SPTP program at LSH. *See Chubb v. Keck*, No. 17-3220-SAC, 2020 WL 5653263, *5 (D. Kan. Sept. 23, 2020). Defendants "may identify the legitimate penological interests that justified the impinging conduct, and the burden then returns to the prisoner to show that these articulated concerns were irrational." *McKinley v. Maddox*, 493 F. App'x 928, 932 (10th Cir. 2012). The court then balances factors set forth by the Supreme Court in *Turner*, 482 U.S. at 89-91 (1987), "to determine the reasonableness" of the conduct. *McKinley*, 493 F. App'x at 932.[18] Here, Section IV.A above describes the various legitimate

---

[17] *See id.*

[18] *Turner* requires the court to consider four factors: (1) whether a valid and rational connection exists between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact of the accommodation on prison guards, other inmates, and the allocation of prison resources generally; and (4) whether there are "ready alternatives" to the regulation in question. *Turner*, 482 U.S. at 89-90. *See also Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 80-81 (5th Cir.1992) (*citing O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987)) (explaining that a court need not "weigh evenly, or even consider, each of these factors," as rationality is the controlling standard).

penological interests that motivated the relevant restrictions on group activities at LSH. The burden now shifts to Thayer to show that these articulated concerns were irrational.

**E. Qualified immunity because no clearly established law shows the restrictions on group activities to be a violation of Thayer's constitutional rights.**

Even if Thayer could establish his constitutional rights had been violated by an individual defendant, he cannot establish that the right was clearly established at the time of the challenged conduct. Accordingly, no clearly established law would have put Defendants on notice that their alleged actions were unlawful under these circumstances. Defendants are entitled to qualified immunity as a matter of law and therefore summary judgment as well.[19]

**V.   Even if Thayer states a claim that survives summary judgment, he is not entitled to punitive damages for lack of the requisite subjective intent.**

RLUIPA claims cannot be brought for monetary damages, *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), such as punitive damages. And Thayer cannot receive punitive damages under § 1983 because he has not alleged or provided any evidence that any defendants acted with the required maliciousness, evil motive, or with reckless indifference to McCoy's civil rights, or that they subjectively knew their actions were unconstitutional under clearly established law. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992). Therefore, as a matter of law, Thayer cannot receive punitive damages.

---

[19] *Cf. Spell v. Edwards*, 579 F. Supp. 3d 806, 825 (M.D. La. 2022), *aff'd*, No. 22-30075, 2023 WL 2110889 (5th Cir. Feb. 17, 2023) (holding qualified immunity barred claims against Governor regarding his COVID-19 orders, which limited indoor religious worship, and against law enforcement officials who, in good faith, enforced the Governor's orders); *Baltas v. Erfe*, No. 3:19CV1820, 2022 WL 4260672, at *12 (D. Conn. Sept. 15, 2022) (citing *Buckles v. Crowe*, No. CV 18-00084, 2021 WL 1341887, at * 6 (D. Mont. Feb. 22, 2021)) (entering summary judgment on qualified immunity regarding a demand for construction of a sweat lodge or transfer to prison with a sweat lodge because "inmate-practitioners of the Native American religion do not appear to enjoy a clearly defined right to sweat lodge access when housed at a prison that has no sweat lodge").

**VI.** **The Court should decline to exercise jurisdiction over the state law claims or, alternatively, should dismiss them.**

    **A.** **The Court should decline to exercise supplemental jurisdiction over the state law claims given the absence of a sufficient federal claim.**

"When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir.2011). Here, all federal claims should be dismissed for the reasons outlined above, and the court should decline to exercise jurisdiction over any remaining state claims.

    **B.** **Alternatively, the Court should dismiss the state law claims for lack of a private cause of action, failure to exhaust, and lack of a violation.**

If the Court decides to exercise supplemental jurisdiction, it should enter summary judgment to the Defendants. First, the statute does not provide a private cause of action against the Defendants for any relief in their personal capacities. *Merryfield v. Sullivan*, 308 P.3d 30, 2013 WL 4730565, * 1 (Kan. Ct. App. Aug. 30, 2013). Second, it does not create a claim for damages if its provisions are violated, much less a claim that could survive the State's immunity under the Kansas Tort Claims Act.[20] Third, Thayer failed to file with his complaint "proof that all administrative remedies have been exhausted" as required under K.S.A. 59-29a24. *See also* K.S.A. 59-29a22(f)(1) (requiring exhaustion); K.S.A. 59-29a24 (same); K.S.A. 77-612 (same); K.S.A. 59-29a22(f) (court review is exclusively through the Kansas judicial review act). Finally, the uncontroverted facts do not support a violation of K.S.A. § 59-29a22(b)(8).

For all these reasons, Defendants request that this Court enter summary judgment in their favor on Thayer's RLUIPA, § 1983, and state-law claims.

---

[20] *See Lewis v. City of Lawrence*, 19-2636-KHV, 2020 WL 1446868, at *5 (D. Kan. Mar. 25, 2020) ("The exceptions to the Kansas Tort Claims Act provide immunity to governmental entities or employees in certain situations.").

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH

/s/ Matthew L. Shoger
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September, 2023, the foregoing document was filed with the clerk of the court by using the CM/ECF system, with a copy to be served by means of first-class mail on the 9th day of September, 2023, postage prepaid, addressed to:

David W. Thayer
Larned State Hospital
Dillon Building East One
1301 KS Highway 264
Larned, KS 67550
*Plaintiff, pro se*

*/s/ Matthew L. Shoger*
Matthew L. Shoger
Assistant Attorney General